IN THE DISTRICT COURT OF THE VIRGIN ISLANDS
DIVISION OF ST. CROIX

LINDA VALERINO                  :        CIVIL ACTION
                                :
            v.                  :
                                :
UNITED STATES OF AMERICA,       :
et al.                          :        NO. 05-0139

MEMORANDUM

Bartle, C.J.                                    May 15, 2008

        We are faced with the post-trial motions of the
Government after a jury verdict in favor of plaintiff, Linda
Valerino.

        On September 20, 2005, Linda Valerino, a Deputy United
States Marshal on St. Croix in the Virgin Islands, filed a multi-
count complaint against defendants, the United States of America,
the Attorney General of the United States of America ("Attorney
General"), the United States Department of Justice ("DOJ") and
the United States Marshals Service ("Marshals Service").
Thereafter, plaintiff filed an amended complaint asserting four
claims.[1]  Count I of her amended complaint alleged gender

_____

1.   On October 3, 2006 we granted the motion of defendant, the
United States of America, to dismiss Count IV of plaintiff's
original complaint against it alleging violations of the Privacy
Act, 5 U.S.C. § 552a.  We also granted the motion of defendants,
the DOJ and the Marshals Service, to dismiss Counts I and III of
plaintiff's complaint alleging violations of Title VII of the
Civil Rights Act of 1964 ("Title VII") and the Virgin Islands
Civil Rights Act, 10 V.I.C. §§ 1-11.  We further dismissed Counts
I and III against defendant, the United States of America.

discrimination in violation of Title VII and the Virgin Islands Civil Rights Act against the Attorney General.[2]  Count II claimed a violation of the Equal Pay Act, 29 U.S.C. § 206(d), against defendants, the United States of America, the Attorney General, the DOJ, and Marshals Service, on the ground that for a certain period a male Deputy Marshal received greater compensation than plaintiff for equal work.  In Count III she asserted retaliation in violation of Title VII against the Attorney General.  Finally, Count IV averred violations of the Privacy Act against the Attorney General, the DOJ and Marshals Service.  On November 15, 2007 we granted the motion of the Attorney General, the DOJ, and the Marshals Service for summary judgment on Count IV of the amended complaint alleging violations of the Privacy Act, 5 U.S.C. § 552a.

A jury trial was held on the three remaining counts of the amended complaint.  During the trial, however, plaintiff agreed to withdraw her claim based upon violations of the Equal Pay Act under Count II.  The jury was left to determine whether plaintiff had proven that the Marshals Service:  (1) discriminated against her by failing to promote her to the position of Supervisory Deputy United States Marshal; (2) subjected her to a hostile or abusive work environment; and (3) retaliated against her for filing a complaint of discrimination

---

2.  At trial, plaintiff relied on Title VII only as the basis of her discrimination claims, not the Virgin Islands statute.  Accordingly, this court did not charge the jury separately on the Virgin Islands statute.

with the Equal Employment Opportunity Commission ("EEOC").  The jury returned a verdict in favor of Ms. Valerino on all three claims and awarded her $500,000 in compensatory damages.[3]

The Government moved for judgment as a matter of law under Rule 50 of the Federal Rules of Civil Procedure.  We granted the motion with respect to plaintiff's claim of gender discrimination in failing to promote her to the position of Supervisory Deputy United States Marshal.[4]  We also reduced the compensatory damage award to $300,000 as required under Title VII, 42 U.S.C. § 1981a(b)(3)(D).  In addition, we awarded plaintiff $92,314 in back pay.  As a result, judgment was entered in her favor in the amount of $392,314.

The Government has now moved for judgment as a matter of law or, in the alternative, a new trial under Rules 50 and 59 of the Federal Rules of Civil Procedure.  It has also filed a motion for remittitur or, in the alternative, a new trial on

---

3.  Although all defendants remained parties to this action, it was agreed that they would proceed through the trial as one.  The judgment was entered against the Attorney General of the United States.  To simplify the matter, we will refer to the defendants collectively as "the Government" throughout this opinion.

4.  Plaintiff alleged that she was not promoted to the position of Supervisory Deputy United States Marshal because of a series of Internal Affairs complaints filed against her by her male co-workers.  Marshals Service employees are ineligible for promotions while Internal Affairs complaints are pending.  The evidence showed, however, that an Internal Affairs complaint was filed against plaintiff by a third-party.  Thus, even if her male co-workers had not filed Internal Affairs complaints against her, plaintiff would have been ineligible for the promotion.  We therefore granted the motion of the Government for judgment as a matter of law on that claim.

compensatory damages.  Since the two motions substantially overlap, we shall consider them together.

I.

With respect to the defendants' motion for judgment as a matter of law, the court must view the evidence, along with all reasonable inferences therefrom, in the light most favorable to the verdict winner, in this case, the plaintiff.  <u>Alexander v. Univ. of Pittsburgh Med. Ctr. Sys.</u>, 185 F.3d 141, 145 (3d Cir. 1999).

Plaintiff began employment with the Marshals Service in 1987.  In 1994, she was transferred to the District of the Virgin Islands on St. Croix.  Plaintiff was the first and only female Deputy Marshal permanently assigned to the St. Croix office.[5] Sometime between November, 2002 and early January, 2003, while plaintiff was Deputy in Charge, she overheard a conversation between Deputy Marshals James Nase and Clarence Brown, two of her male co-workers.[6]  During the conversation, Deputy Marshal Nase

_____

5.  The highest employee in the Marshals Service in each district is the U.S. Marshal who is appointed by the President.  Below the Marshal is the Chief Deputy Marshal and below that position is the Supervisory Deputy Marshal.  There is also a position of Deputy in Charge.  However, that position only exists when the Supervisory Deputy Marshal is not in the office or otherwise unavailable.  Below all of those positions are the Deputy Marshals.

6.  Plaintiff did give some background testimony regarding events that transpired prior to November, 2002.  However, that testimony was merely used to give context to the Marshals Service's conduct beginning in November, 2002, the start of the scope of this lawsuit.

said that he would not work for a female supervisor and "can
stoop pretty low."  Trial Tr. 27, Jan. 14, 2008.  Deputy Marshal
Brown responded, "I bet I can go even lower."  Id.

On November 8, 2002, Deputy Marshal Brown filed the
first of a series of Internal Affairs complaints against
plaintiff.  In this particular complaint, Deputy Marshal Brown
alleged that plaintiff committed perjury while testifying during
a hearing on March 26, 2002.  While Deputy Marshal Brown was
present at the March 26, 2002 hearing, he waited almost eight
months to file the Internal Affairs complaint.  Plaintiff was
cleared of the charges.  On March 14, 2003 plaintiff filed a
discrimination complaint against the Marshals Service with the
EEOC.[7]  Within a short time thereafter, a number of additional
Internal Affairs complaints were filed against plaintiff by male
deputy marshals.  Internal Affairs complaints, regardless of
their merits, are detrimental to deputy marshals against whom
they are filed because they cannot receive promotions or
increases in pay while such complaints are pending against them.
On May 22, 2003, Deputy Marshal Brown filed a second complaint
alleging that plaintiff failed to report damage to the bumper of
plaintiff's government car.  A few days later, on May 30, 2003
Deputy Marshal Brown filed a third Internal Affairs complaint
against plaintiff alleging that she unsafely transported a

---

7.  The original complaint was amended on September 22, 2003,
October 28, 2003, and March 26, 2004.  Plaintiff filed a second
complaint on November 1, 2005.

prisoner in the airport in Puerto Rico.  The Internal Affairs investigations into these complaints likewise concluded that the allegations were unfounded.

On June 2, 2003 plaintiff called Laura Kelso at the Employees Assistance Program ("EAP") of the Marshals Service because she was extremely upset about the two most recent Internal Affairs complaints that Deputy Marshal Brown had filed against her.  Plaintiff asked Ms. Kelso to set up a meeting for her with a psychologist.  Within a few days plaintiff met with Dr. Chester D. Copemann, a clinical and rehabilitation psychologist.  Plaintiff had met with Dr. Copemann on a previous occasion after she was involved in an airplane crash-landing in Puerto Rico during the course of her employment.

In mid-June, 2003, David Drake began working in the Marshals office on St. Croix as the Supervisory Deputy Marshal. Toward the end of July, 2003 and beginning of August, 2003, Deputy Marshal Brown placed a series of screensavers on his computer.  The screensavers were readily apparent to plaintiff because the Marshals Service office on St. Croix is small and the deputy marshals' desks are all located in one common area.  On July 31, 2003 his screensaver read, "Are you going to believe ... me or your lying eyes?"  Plaintiff understood the screensaver to be directed toward her and to reference the perjury allegations Deputy Marshal Brown had leveled against her in November, 2002. After she complained about the screensaver to Chief Deputy

Marshal Ed Sloan and Marshal Conrad Hoover,[8] Deputy Marshal Brown changed the screensaver to "Wow" and then "In the words of Bubba, watch this." Plaintiff testified that she took the last screensaver as a threat.[9] In response to plaintiff's concerns, Supervisory Deputy Marshal Drake instructed employees that all screensavers must be appropriate.

Deputy Marshal Brown filed a fourth Internal Affairs complaint alleging that plaintiff drove past his house on August 1, 2003 to stalk him. Plaintiff countered that it could not have occurred because she was meeting with Marshal Hoover at the time Deputy Marshal Brown reported that the incident took place. This Internal Affairs complaint was also determined to be unfounded.

On September 2, 2003, plaintiff was suffering from stress as a result of what was occurring to her and took extended leave from her job as a deputy marshal. She decided to do so after a visit with Dr. Copemann during which he advised her that

---

8. Hoover served as U.S. Marshal in the Virgin Islands from 1999 until 2007 but now occupies the position of Supervisory Deputy Marshal. Because he served as the U.S. Marshal during the time period relevant here, we will refer to him by the former title throughout.

9. Plaintiff did not testify to the meaning of "In the words of Bubba, watch this." After searching the Internet for the screensavers' meaning, this court believes it is a reference to a class of jokes about a group of people who are colloquially referred to as "rednecks." The premise of such jokes is that "rednecks' last words" are "hey Bubba, watch this," before engaging in risky and careless behavior that causes their untimely demise.

it would be best if she left the work environment for a time. However, plaintiff's difficulties at work did not end while she was on leave.  Despite the fact that she had been doing the job, Supervisory Deputy Marshal Drake decided to terminate plaintiff's duties as Warrant Information Network ("WIN") administrator but never notified plaintiff of the change.  Supervisory Deputy Marshal Drake testified that he made himself the WIN administrator because plaintiff did not have the proper training.

While plaintiff was on leave, she was still required to enter the Marshals Service office in the courthouse to submit time sheets.  On September 19, 2003, Marshal Hoover directed that plaintiff be required to sign-in as a visitor when she entered the courthouse even though that was not, and had never been, required of any other employee in the Marshals Service.  Indeed, plaintiff had previously taken sick leave after shoulder surgery but was never required to sign-in as a visitor.  Three days later, on September 22, 2003 Marshal Hoover lifted the directive[10] because he felt the directive was a misrepresentation of his intention which he said was to enhance the office security.

On March 6, 2004 plaintiff received a pay check stating that she was placed on Absent Without Official Leave, or "AWOL," status.  Plaintiff then went to the Marshals Service office and

---

10.  Plaintiff did not attempt to enter the building while the directive was in place and found out about it approximately a week after it was lifted.

-8-

saw she was posted as AWOL on a board listing the deputy marshals' schedules.  After writing to Supervisory Deputy Marshal Drake to question why she was placed on AWOL status, Deputy Marshal Drake wrote to her that she was placed on AWOL status on February 16, 2004 because she had failed to send him an updated physical examination.  Plaintiff had previously been informed by the Marshals Service's Human Resources and the Employee Assistance Program that such a physical examination was not required.  Plaintiff was not given prior notice of her status change despite a Marshals Service procedure requiring that this be done.

In March, 2004, while she was still on leave, Supervisory Deputy Marshal Drake removed plaintiff's belongings from her desk, boxed them, and placed them in a closet. Plaintiff testified that another male deputy marshal who periodically left the island for long and indefinite stretches of time never had his belongings treated in the same way.  On March 16, 2004 yet another Internal Affairs complaint was filed against plaintiff, this time by Supervisory Deputy Marshal Drake. This complaint alleged that plaintiff had planted drug evidence at least three years earlier, in 2000 or 2001.  While plaintiff did not testify specifically regarding the outcome of the Internal Affairs complaint, she did state that by the time Supervisory Deputy Marshal Drake filed the Internal Affairs complaint the defendant in question had already pled guilty and admitted that the drugs were his.

-9-

Cyndi Brown, secretary to Magistrate Judge George Cannon, testified at trial that she overheard Supervisory Deputy Marshal Drake say on July 6, 2004 that he was "trying to get Valerino off the books."  On July 8, 2004, plaintiff returned to her job with the Marshals Service after her extended leave of absence.  Plaintiff's situation did not improve.  Cyndi Brown further related that on September 9, 2004 she overheard Supervisory Deputy Marshal Drake say that he could not take vacation because "princess Linda is back and she can't be trusted to guard the bathroom."

In April, 2005 Deputy Marshal Eric Brown, who was on a discreet assignment on St. Croix, used epoxy to affix plaintiff's hand sanitizer to her rolodex and taped down her phone receiver. In early August, 2005, Deputy Marshal Robert Roberg, a judicial security inspector for the Marshals Service, was on a temporary assignment in St. Croix.  While there, he cut out a cartoon from the local newspaper, passed it around to some of the other deputy marshals and posted it on Supervisory Deputy Marshal Drake's office door.  The punch line of the cartoon read:  "All women are nuts."  Valerino was not given the cartoon but saw it on Supervisory Deputy Marshal Drake's office door.  Later in that same month plaintiff was scheduled to leave for a vacation.  Ten minutes before she left, Supervisory Deputy Marshal Drake presented her with a letter of instruction regarding what he perceived to be a problem with tardiness.  Supervisory Deputy Marshal Drake refused to discuss the letter with plaintiff but

-10-

told her to think about it while away.  Not surprisingly, plaintiff testified that she was preoccupied with the letter during her vacation.

In September, 2005 Deputy Marshal Drake changed plaintiff's time sheets without her authorization because he believed she was over-reporting her time.  Plaintiff brought the change to Chief Deputy Marshal Bradshaw's attention, and the time sheets were then changed back to what plaintiff had submitted.

Plaintiff testified extensively about the severe emotional distress she experienced because of her work situation.  She lost interest in her job and considered transferring to a location off of St. Croix.  Plaintiff had hosted a television show called "Virgin Islands' Most Wanted."  She was extremely proud of this effort but ultimately gave it up because of the stress she was experiencing in the workplace.  Plaintiff also stated that she no longer enjoyed activities outside of work that she had previously relished, such as serving as lector at her church.  She felt embarrassed by what was happening at work and "tr[ied] to minimize her exposure to the community."  Trial Tr. 68, Jan. 15, 2008.

Dr. Copemann, plaintiff's psychologist, was called as a witness.  He opined that plaintiff experienced anxiety and depression.  He added that plaintiff exhibited no evidence of malingering and would likely experience future job-related anxiety and depression because of the work environment to which she had been subjected.

II.

Rule 50 provides that judgment as a matter of law should be granted if there is no "legally sufficient evidentiary basis to find for the party on that issue." Fed. R. Civ. P. 50(a). "Although judgment as a matter of law should be granted sparingly, a scintilla of evidence is not enough to sustain a verdict of liability." Lightning Lube, Inc. v. Witco Corp., 4 F.3d 1153, 1166 (3d Cir. 1993) (citation omitted). "In determining whether the evidence is sufficient to sustain liability, the court may not weigh the evidence, determine the credibility of the witnesses, or substitute its version of the facts for the jury's version." Id. (citation omitted).

In the alternative to the Government's motion for judgment as a matter of law, it moves for a new trial under Rule 59. Rule 59 provides that "The court may, on motion, grant a new trial ... after a jury trial, for any reason for which a new trial has heretofore been granted in an action at law in federal court ...." Fed. R. Civ. P. 59(a). The standard for granting a new trial, although lower than that required for judgment as matter of law, is still high. Sheridan v. E.I. DuPont de Nemours & Co., 100 F.3d 1061, 1076 (3d Cir. 1996), citing Roebuck v. Drexel Univ., 852 F.2d 715, 735-36 (3d Cir. 1988). "A new trial should be granted only where the 'great weight' of the evidence cuts against the verdict and 'where a miscarriage of justice would result if the verdict were to stand.'" Springer v. Henry, 435 F.3d 268, 274 (3d Cir. 2006) (citation omitted). Our Court

-12-

of Appeals has explained that "this stringent standard is necessary to ensure that a district court does not substitute its judgment of the facts and the credibility of the witnesses for that of the jury." Sheridan, 100 F.3d at 1076 (quotations omitted).

The Government submits in its motion for judgment as a matter of law or, in the alternative, new trial, that there is insufficient evidence for the jury to find that plaintiff was subject to a hostile work environment.  We instructed the jury that to prove a hostile work environment plaintiff must show that she was subjected to harassment by Marshals Service employees, the conduct was not welcomed by her, the conduct was motivated by the fact that she is a woman, the conduct was so severe or pervasive that a reasonable person in her position would find her work environment to be hostile or abusive, plaintiff believed her work environment to be hostile or abusive as a result of the conduct of the Marshals Service employees, and management level employees knew, or should have known, of the abusive conduct. See Harris v. Forklift Sys., 510 U.S. 17, 21-23 (1993). Presently, the Government argues that plaintiff failed to prove that the actions of the Marshals Service employees were motivated by gender and that there was no evidence of severity or pervasiveness.

It goes without saying that it can be exceedingly difficult to prove through direct evidence that harassing conduct

-13-

was motivated by a plaintiff's gender.  Our Court of Appeals has
noted:

> Though they still happen, the instances in
> which employers and employees openly use
> derogatory epithets to refer to fellow
> employees appear to be declining.
> Regrettably, however, this in no way suggests
> that discrimination based upon an
> individual's race, gender, or age is near an
> end.  Discrimination continues to pollute the
> social and economic mainstream of American
> life, and is often simply masked in more
> subtle forms.  It has become easier to coat
> various forms of discrimination with the
> appearance of propriety, or to ascribe some
> other less odious intention to what is in
> reality discriminatory behavior.  In other
> words, while discriminatory conduct persists,
> violators have learned not to leave the
> proverbial "smoking gun" behind.  As one
> court has recognized, "defendants of even
> minimal sophistication will neither admit
> discriminatory animus or leave a paper trail
> demonstrating it." Riordan v. Kempiners, 831
> F.2d 690, 697 (7th Cir. 1987).

Aman v. Cort Furniture Rental Corp., 85 F.3d 1074, 1081-82 (3d
Cir. 1996).

The vast majority of plaintiffs are therefore left to
make their cases through indirect and circumstantial evidence.
Valerino was left with that task.  She was the only female Deputy
Marshal permanently stationed as part of a small contingent on
St. Croix.  Plaintiff gave detailed testimony about the numerous
incidents at the Marshals Service that were directed toward her
and to which she took offense.  Significantly, the jury heard
testimony about a November, 2002 conversation between Deputy
Marshals Nase and Brown, during which Deputy Marshal Nase said
that he would not work for a female supervisor and that he "can

stoop pretty low" and Deputy Marshal Brown responded, "I bet I can go even lower."  The jury also heard testimony from Cyndi Brown that Supervisory Deputy Marshal Drake said that he "was trying to get Valerino off the books" and could not take a vacation because "princess Linda is back and she can't be trusted to guard the bathroom."  Plaintiff was the subject of five unfounded Internal Affairs complaints.[11]  In addition, she was the target of offensive screensavers; had the WIN administrator duties taken away; was required, unlike her male counterparts, to sign-in for a time as a visitor to the courthouse; was wrongly placed on AWOL status and without proper notification; had her belongings, unlike a similarly situated male deputy marshal, removed from her desk; had her phone and rolodex tampered with; was subjected to a cartoon stating "[a]ll women are nuts"; was given a letter of instruction about tardiness immediately before leaving for vacation; and had her time sheets improperly changed by Supervisory Deputy Marshal Drake.

While her fellow male co-workers testified that their actions were not motivated by Valerino's gender, the jury clearly disbelieved them.  The evidence was sufficient to establish that the actions taken against Valerino were motived by her gender.

---

11.  In her response to the defendant's motion for judgment as a matter of law, plaintiff states that there were seven or eight Internal Affairs complaints filed against her.  The record, however, shows only five Internal Affairs complaints were filed against her by Marshals Service employees.

It is not for the court to substitute its judgment for that of the jury, and we will decline to do so.

Moreover, there was sufficient evidence of severity or pervasiveness to sustain the jury's verdict.  See Harris, 510 U.S. at 21.  Plaintiff did not merely testify to one or two isolated incidents but described a series of occurrences and how severely they affected her.  Dr. Copemann corroborated what she said.  Though some of the incidents may seem insignificant when viewed in isolation, the evidence exhibited a pattern of conduct toward plaintiff over several years.  A single offensive screensaver or one Internal Affairs complaint may not be sufficient to give rise to an actionable claim of discrimination but that was not the case here.  The jury was free to judge whether the actions were so severe or pervasive that a reasonable woman would also find the work environment hostile or abusive.

We also charged the jury on retaliation.  We instructed the jury that to find retaliation it must find that plaintiff filed a complaint with the EEOC, that she was subject to a materially adverse action thereafter, and that there was a causal connection between the filing of the complaint and the adverse action.  See Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 59-70 (2006).  In determining whether there is a causal connection, temporal proximity between the protected activity, in this case the EEOC complaint, and the materially adverse action, can be important but is not necessarily dispositive.  See Marra

v. Philadelphia Hous. Auth., 497 F.3d 286, 302 (3d Cir. 2007).
As with any discrimination claim, context is important.

      The Government maintains that there was no evidence of
a materially adverse action or a causal connection.  We disagree.
Based on evidence described at length above, we conclude that
there was ample evidence presented at trial for the jury to
conclude that plaintiff was subjected to retaliation.

      A materially adverse action under the anti-retaliation
statute does not require that the adverse action be job related.
Burlington, 548 U.S. at 61-67.  It merely means that "a
reasonable employee would have found the challenged action
materially adverse, which in this context means it well might
have dissuaded a reasonable worker from making or supporting a
charge of discrimination."  Id. at 68.  The Government argues
that her retaliation claim fails because plaintiff continued to
amend her original EEOC complaint three times and filed a second
EEOC complaint on November 1, 2005.  According to the Government,
she was not dissuaded from "making or supporting a charge of
discrimination."  It cites no case to support this proposition,
and we do not find this argument persuasive.  In effect, it
maintains that plaintiffs who have filed an EEOC complaint and
then subsequently are retaliated against or, more generally,
subject to further discrimination, should not report that
conduct, for if they do, they would be precluded from filing a
claim for retaliation.  Victims of discrimination should not be

forced to sit idly by and silently endure further retaliation and discrimination to preserve a claim under Title VII.

With regard to causation, on March 14, 2003 plaintiff filed her first complaint with the EEOC complaint.  Two months later, in May, 2003, Deputy Marshal Brown filed two Internal Affairs complaints against plaintiff.  Although Marshal Hoover, Chief Deputy Bradshaw, Deputy Marshal Drake, and Deputy Marshal Roberg testified that none of their actions was motivated by plaintiff's complaints, it is again the role of the jury to weigh the credibility of each witness and decide who it believes or does not believe.  That determination is a classic jury question, and one that we will not second guess.

In the alternative, the Government moves for a new trial based upon the admission of certain testimony during trial. First, the Government argues that plaintiff testified extensively about pre-November, 2002 conduct, that is, conduct outside of the scope of this case.  Prior to trial this court ruled that plaintiff could introduce some evidence of pre-November, 2002 conduct as background.  Contrary to the Government's contention, the plaintiff's testimony regarding pre-November, 2002 conduct was not a significant portion of her entire testimony but merely provided context for the conduct that was within the scope of this action.

In a footnote, the Government also contends that plaintiff impermissibly testified about her religious beliefs. During trial the Government objected to a line of questioning on

-18-

this subject.  This court ruled at sidebar that plaintiff could
testify about "how her life changed" with respect to her role at
her church but could not testify regarding "her religious
beliefs."  Trial Tr. 67, Jan. 15, 2008.  The testimony at trial
did not ignore that ruling:

> Q.  Are you a practicing Catholic?
> A.  Yes.
> Q.  And you attend church regularly?
> A.  Yes, I do.
> Q.  And throughout all of the time period
>     you're talking about, you've been a
>     regular attendee?
> A.  Yes, even more so.
> Q.  One of the things you do is, you do
>     readings at church, or used to?
> A.  I used to be a lecter [sic], and that
>     means that you read in front of the
>     church.
> Q.  Was that an important thing for you?
> A.  From the Bible, yes, it was?
> Q.  And did you stop doing it?
> A.  Yes, I stopped because I was afraid of
>     these allegations going public, and I
>     was trying to minimize my exposure to
>     the community.

Trial Tr. 67-68, Jan. 15, 2008.

This brief testimony about plaintiff's decision to stop
being a lector at her church as a result of what was happening to
her at work did not violate this court's ruling or unfairly
prejudice the Government.

Next, the Government maintains that a new trial is
necessary because in his closing statement plaintiff's attorney
stated:  "And discrimination is very difficult to unearth in the
workplace, and I submit to you that what we have shown is merely
a tip of the iceberg.  The stuff that we have been able to

unearth.  And if I submit that if this is what we have shown, there is far more out there."  Trial Tr. 43, Jan. 17, 2008.  The Government argues that this statement alludes to two EEOC complaints filed by plaintiff in August, 2006 and August, 2007. Prior to trial we ordered that evidence regarding those complaints was beyond the scope of this action and therefore inadmissible.  However, the Government did not object to counsel's statement at trial.  "[A] party who fails to object to errors at trial waives the right to complain about them following trial."  Waldorf v. Shuta, 142 F.3d 601, 629 (3d Cir. 1998) (citation omitted).[12]  Therefore, since the Government did not object to counsel's statement that the evidence was the "tip of the iceberg," we cannot entertain its objection now.

The Government further objects to the admission of hearsay statements made by Deputy Marshals Brown, Nase, and Peter Rouse.  We permitted plaintiff to testify about the conversation she overheard between Deputy Marshals Brown and Nase wherein Deputy Marshal Nase said that he would not work for a female supervisory and that he "can stoop pretty low," and Deputy Marshal Brown responded, "I bet I can go even lower."  Trial Tr. 27, Jan. 14, 2008.  Plaintiff argues that the Government waived any objection to the admission of this testimony because the Government did not object during trial.  The Government points

---

12.  The Government also contends that plaintiff impermissibly testified about an Internal Affairs complaint against Marshal Hoover.  Again, the Government did not object during trial. Therefore, we cannot consider this issue now.

out that the admissibility of this testimony had been discussed
with this court in chambers before trial began and the
undersigned indicated that this testimony would be allowed.  As a
result, the Government states that it did not believe it was
necessary to renew its objection during the testimony.
Regardless of pretrial discussions in chambers, a party must
preserve objections on the record.  See Waldorf, 142 F.3d at 629.
In any event, plaintiff's testimony is admissible under Rule 803
of the Federal Rules of Evidence which carves out a hearsay
exception for "[a] statement of the declarant's then existing
state of mind, emotion, sensation, or physical condition (such as
intent, plan, motive, design, mental feeling, pain, and bodily
health) ...."  Fed. R. Evid. 803(3).  The conversation between
Deputy Marshals Brown and Nase was offered to show that they had
an "intent, plan, motive, [or] design" to create a hostile work
environment for plaintiff.

This court also allowed plaintiff to relate a
conversation she had with Deputy Marshal Rouse.  Plaintiff
testified:  "Peter Rouss [sic] called me up, and he said, Linda,
I just want you to know that Jim Nase is over here on assignment,
and he's trashing your name to the out-of-town Special Assignment
Deputy Marshals.  He also said that he was going to do everything
possible to see to it that you don't become supervisor."  Trial
Tr. 39, Jan. 14, 2008.  Plaintiff did not seek admission of this
conversation for the truth, but to explain the impetus for an
Internal Affairs complaint she filed against Deputy Marshal Brown

-21-

in January, 2003.  That is, plaintiff sought to explain that she believed Deputy Marshals Nase and Brown were working together to discriminate against her and therefore filed an Internal Affairs complaint against Deputy Marshal Brown when he filed the two unfounded Internal Affairs complaints against her.  We twice instructed the jury about the limited purpose of the plaintiff's testimony regarding this conversation:

> Members of the jury, Miss Valerino just testified about some statements made by Peter Rouss [sic].  Those statements are not being introduced for the truth of those statements.  That is, it's not necessarily true what he was saying.  I'm not saying that it's not true but it doesn't matter.  All it's being introduced for is the basis for why ... Miss Valerino is going to file a complaint against Clarence Brown.  Because she has been told this by Mr. Rouss [sic] doesn't mean what Mr. Rouss [sic] said was true, but it was the reason why she did file a complaint against Mr. Brown.  So she says.
> ...
> Again, I want to say to the jury, it's not necessarily true that Mr. Rouss [sic] said that, and you shouldn't take it for the truth.  Again, it's the basis for Miss Valerino's Internal Affairs complaint.

Trial Tr. 38-39, Jan. 14, 2008.

This instruction to the jury was sufficient to clarify the purpose for which plaintiff's conversation with Deputy Marshal Rouse was admitted into evidence.  We do not believe that our rulings constitute an error as a matter of law and will therefore deny the Government's motion on these grounds.  See Klein v. Hollings, 992 F.2d 1285, 1289-90 (3d Cir. 1993).

The Government also contends that the testimony regarding plaintiff's discrimination claim for failure to promote tainted the jury's verdict in favor of plaintiff on her hostile work environment and retaliation claims.  As noted above, while the jury found in favor of plaintiff on her discrimination claim for failure to promote her, we set that verdict aside and entered judgment in favor of the Government.  We disagree with the Government that the verdict on the remaining claims was tainted. The jury was instructed separately as to each claim and the jury had to answer separate special interrogatories as to each.  Our subsequent decision granting the Government judgment as a matter of law on the discrimination count for failure to promote plaintiff to the position of Supervisory Deputy Marshal does not require a new trial on the hostile work environment or retaliation claims.

III.

The Government has also moved for remittitur of the capped jury award of $300,000 in non-economic damages, which the court had already reduced from $500,000 as required under 42 U.S.C. § 1981a(b)(3)(D).  This court may not lower the $300,000 award simply because it would have awarded a lesser amount had it been sitting as the fact finder.  Gumbs v. Pueblo Int'l, Inc., 823 F.2d 768, 771 (3d Cir. 1987).  "A jury has very broad discretion in measuring damages ...." Id. at 773.  Instead, we must review the evidence to determine whether there is a "rational relationship between the specific injury sustained and

-23-

the amount awarded." Id.  In general, we may grant remittitur
only if the verdict awarded is "so grossly excessive as to shock
the judicial conscience." Keenan v. City of Philadelphia, 983
F.2d 459, 469 (3d Cir. 1992).  If the damages are subject to
mathematical calculation, there must be sufficient facts from
which a jury "'can arrive at an intelligent estimate without
speculation or conjecture.'" Scully v. US WATS, Inc., 238 F.3d
497, 515 (3d Cir. 2001) (citation omitted).  If we deem
remittitur appropriate, we "may not require a reduction in the
amount of the verdict to less than the 'maximum recovery' that
does not shock the judicial conscience." Gumbs, 823 F.2d at 774
(citing Gorsalitz v. Olin Mathieson Chem. Corp., 429 F.2d 1033,
1046-47 (5th Cir. 1970)).  We are afforded great deference in
deciding whether to grant remittitur because a district court
"'is in the best position to evaluate the evidence presented and
determine whether or not the jury has come to a rationally based
conclusion.'" Evans v. Port Auth. of N.Y. & N.J., 273 F.3d 346,
354 (3d Cir. 2001) (citation omitted).

        The Government maintains that the jury included damages
for plaintiff's discrimination claim based on the alleged
discrimination from 2000 to November, 2002 and on the Marshals
Service's failure to promote her to the position of Supervisory
Deputy United States Marshal in late April, 2003.  What the
Government ignores is that the gravamen of the testimony at trial
regarding plaintiff's mental and physical well being focused on
the effects of the hostile work environment and retaliatory

-24-

conduct, not the failure of the Marshals Service to promote her. We acknowledge that it is impossible to know precisely how much of the jury's original $500,000 award included emotional distress for failure to promote plaintiff.  However, we have already reduced the jury's award by 40% to the statutory cap of $300,000. Given the evidence presented at trial, it is unreasonable to conclude that at least 60% of the damages awarded by the jury did not represent compensation for plaintiff's emotional distress from the hostile work environment and retaliation claims. Although plaintiff testified about her disappointment when she was passed over for the position of Supervisory Deputy Marshal, her testimony regarding the emotional toll she suffered concentrated on the day in and day out actions of her male co-workers against her.  While plaintiff was passed over for the promotion in April, 2003, she did not take a leave of absence from the Marshals Service until September, 2003, after the screensavers incidents and the stalking allegation.  That particularly difficult time for plaintiff was clearly the impetus for her taking leave, the real nub of plaintiff's emotional distress damages, not the failure to be promoted.  Dr. Copemann's testimony substantiated that it was the ongoing hostility plaintiff was experiencing at work that caused her anxiety and depression and finally led him to recommend that plaintiff take a leave of absence because of her ongoing difficulties.

        Finally, the testimony regarding events that took place before November, 2002 was mere background.  The jury was

explicitly instructed that it "must award Ms. Valerino an amount that will fairly compensate her for any injury she actually sustained as a result of her employer's conduct beginning in November, 2002."  (Doc. #133).  We have no reason to believe that the jury disregarded our instruction.  Accordingly, we will deny the Government's motion for remittitur or, in the alternative, a new trial on damages.

                              BY THE COURT:


                              /s/ Harvey Bartle III
                              HARVEY BARTLE III         C.J.
                              SITTING BY DESIGNATION